UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CHRISTINA M. TUCKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-4 |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

This matter is before the court on the petition for judicial review of the decision of the Commissioner filed by the plaintiff, Christina M. Tucker, on January 4, 2016.[2] For the following reasons, the decision of the Commissioner is **AFFIRMED.**

*Background*

The plaintiff, Christina M. Tucker, filed an application for Supplemental Security Income on December 18, 2012, alleging a disability onset date of October 1, 2012. (Tr. 10). The Disability Determination Bureau denied Tucker's application on April 9, 2012, and again upon reconsideration on June 12, 2013. (Tr. 10). Tucker subsequently filed a timely request for a hearing on July 10, 2013. (Tr. 10). A hearing was held on October 2, 2014, before Administrative Law Judge (ALJ) Terry Miller, and the ALJ issued an unfavorable decision on

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] On April 1, 2016, this case was reassigned to Magistrate Judge Susan L. Collins upon the parties' consent under 28 U.S.C. § 636(c), and then was reassigned to Magistrate Judge Andrew P. Rodovich. On October 12, 2016, the court ordered the parties to file any objection to Magistrate Judge Rodovich conducting all further proceedings in this case. Because neither party filed an objection, this court finds that the parties voluntarily consent to Magistrate Judge Rodovich under 28 U.S.C. § 636(c).

December 17, 2014. (Tr. 10-26). Vocational expert (VE) Sharon D. Ringenberg, Tucker, and Tucker's mother, Anne Johnson, testified at the hearing. (Tr. 10). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Tucker had not engaged in substantial gainful activity since December 18, 2012, the application date. (Tr. 12). At step two, the ALJ determined that Tucker had the following severe impairments: history of low back pain, likely myofascial, obesity, history of headaches including migraines, major depressive disorder/depressive disorder, and anxiety. (Tr. 12). The ALJ reported that Tucker's impairments, or combination of impairments, were severe and more than minimally affected her ability to perform work related activities that required heavy lifting, extreme climbing, and more than occasional performance of other postural maneuvers. (Tr. 12). Also, the ALJ indicated that she must avoid exposure to loud noises and bright flashing lights, and that she could not tolerate sudden or unpredictable work place changes. (Tr. 12). Finally, he found that Tucker could not maintain tasks requiring intense or focused attention for prolonged periods and that her ability to interact with others was diminished. (Tr. 12).

The ALJ found that Tucker's right shoulder complaints were resolved in less than seven months and that her allegations of ongoing pain were not supported by the evidence. (Tr. 12). Tucker claimed that her fingers locked up, but she was unsure of how long it had been happening. (Tr. 12). The ALJ determined that the evidence was insufficient to establish a severe hand, finger, or wrist impairment. (Tr. 12-13). Tucker reported that she had left arm numbness that tingled and extended down to her fingertips at her October 9, 2013 and November 28, 2013 primary care visits. (Tr. 13). However, the ALJ indicated that both examinations were normal.

(Tr. 13). Tucker saw R. Yu Mendador, M.D., who reported no abnormal upper extremity findings and no diagnosis of hand or wrist problems. (Tr. 13.)

The ALJ also found that Tucker's left arm complaints were resolved in less than 12 months and that her examination results were normal. (Tr.13). On November 8, 2012, Tucker complained about her right wrist and reported that she was unable to lift more than two pounds. (Tr. 13). She was prescribed Naprosyn, which the ALJ indicated appeared to be effective because no further reports of wrist pain were made during treatment. (Tr. 13). Moreover, Tucker had full range of motion and her fine manipulation, gross manipulation, gripping, and grasping were intact at the 2013 consultative physical examination. (Tr. 13).

Tucker testified that she experienced pain in the back of her legs if her legs got cold and that at times she felt like her foot was curving in. (Tr. 13). She reported that Dr. Yu-Mendador believed that neuropathy was present in her legs due to a previous head injury. (Tr. 13). However, the ALJ indicated that Tucker was prescribed Neurontin for treatment of restless leg syndrome (RLS). (Tr. 13). The ALJ noted that the records did not indicate that Tucker failed to respond to treatment for RLS or that it occurred for the 12-month durational requirement. (Tr. 13-14). Tucker also complained of chest pain, but the ALJ found that Dr. Yu-Mendador's records showed intermittent complaints of chest pain and that no cardiac testing had been recommended or performed. (Tr. 14). The ALJ noted that at Tucker's most recent visit in May 2014 she did not complain of chest pain. (Tr. 14).

At step three, the ALJ concluded that Tucker did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 14). Specifically, the ALJ found that Tucker did not meet Listing 1.04, Disorders of the Spine, because there was no evidence of root compression, limitation in motion, motor loss, and she

3

performed a positive straight leg test. (Tr. 14). Also, the ALJ found that Tucker's mental impairments did not meet the criteria of Listings 12.04 or 12.06. In finding that Tucker did not meet the above listings, the ALJ considered the paragraph B criteria for mental impairments, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 14). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 14-15).

The ALJ found that Tucker had mild restrictions in daily living activities. (Tr. 15). The ALJ indicated that the treatment record was inconsistent with the testimony of Tucker and her mother that Tucker had more bad days than good and stayed in bed on bad days. (Tr. 15). Throughout her treatment at the Bowen Center, which began in late 2012, psychiatrist S. Maharjan, M.D., reported that Tucker was able to do her daily routine and daily chores with no reports of her spending days in bed. (Tr. 15). The function reports completed by Tucker and her mother in January of 2013 indicated that Tucker prepared simple meals, washed dishes, and helped care for the family's pets. (Tr. 15). Also, Tucker reported that she enjoyed television, movies, and listening to music, but that she had a diminished interest in writing and drawing. (Tr. 15). She testified that she spent her time playing games and on the computer. (Tr. 15). Also, she occasionally needed to be reminded about her self-care. (Tr. 15). She stated that she was able to cook microwavable meals and on the stovetop occasionally. (Tr. 15). The ALJ concluded that the record as a whole failed to establish more than mild limitations in activities of daily living. (Tr. 15).

The ALJ found that Tucker had moderate difficulties in social functioning. (Tr. 15). Tucker reported that she did not have an interest in having friends. (Tr. 15). However, the ALJ noted that during her treatment at Bowen she indicated that she was interested in establishing friendships. (Tr. 15). In the January 2013 function report, Tucker and her mother confirmed that she did not have difficulty getting along with authority figures. (Tr. 15). The ALJ indicated that Tucker had appropriate interaction with treating and examining sources. (Tr. 15). Therefore, the ALJ concluded that the evidence in the record failed to establish that Tucker was unable to maintain appropriate interactions and that she had marked limitations in social functioning. (Tr. 15).

The ALJ determined that Tucker had moderate difficulties in concentration, persistence, or pace. (Tr. 15). The ALJ noted that the treatment records indicated that Tucker wrote scripts and had a copyrighted piece of fiction, which the ALJ concluded required a high level of concentration and persistence. (Tr. 15). Also, Tucker testified that she was able to play computer games for approximately an hour. (Tr. 15). Dr. Maharjan indicated that Tucker's attention and concentration were either "fair" or "good" and noted an average knowledge/intellect. (Tr. 15). Therefore, the ALJ concluded that the objective evidence failed to establish marked limitations in concentration, persistence, or pace. (Tr. 15).

The ALJ concluded that Tucker did not satisfy the paragraph B criteria because her mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration. (Tr. 16). He also found that Tucker did not satisfy the paragraph C criteria because Tucker's mental impairments would not be expected to cause decompensation if she were placed in a typical work setting and that she could function outside a highly-supportive living arrangement and outside her own home. (Tr. 16).

The ALJ then assessed Tucker's residual functional capacity (RFC) as follows:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), reduced as follows: only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; and, needs to avoid concentrated exposure to loud noise and bright/flashing lights. Mentally the claimant cannot tolerate sudden or unpredictable workplace changes; cannot perform tasks requiring intense/focused attention for prolonged periods; can have only occasional work in close proximity to others to minimize distractions; can tolerate only casual/superficial/brief interactions with others, including supervisors, coworkers, and the general public; only occasional interactions with the general public; no exposure to intense or critical supervision; and, is best suited to working alone, in semi-isolations from others, or as part of a small group.

(Tr. 16). The ALJ explained that in considering Tucker's symptoms he followed a two-step process. (Tr. 16). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical and laboratory diagnostic technique that reasonably could be expected to produce Tucker's pain or other symptoms. (Tr. 17). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Tucker's functioning. (Tr. 17).

Tucker reported that her back pain had developed over time. (Tr. 17). She indicated that her daily pain was at the 7-8/10 level. (Tr. 17). However, the ALJ noted that there were no x-rays of her back. (Tr. 17). Tucker testified that after walking or standing for 10 to 15 minutes she would have to sit. (Tr. 17). Also, she reported that her back pain occurred when lifting more than 10 pounds. (Tr. 17). However, she claimed that she had no problems climbing stairs with the use of a handrail and that she could pick something up from the floor as long as it was not heavy. (Tr. 17). She also testified that she had reoccurring migraines for about two years following a concussion. (Tr. 17). Tucker reported that the migraines occurred three to four days per week and that they lasted about one hour after taking over-the-counter Excedrin. (Tr. 17).

Tucker claimed that she had diagnoses of anxiety, depression, and social anxiety. (Tr. 17). She testified that she cried often and that she either did not sleep or slept too much. (Tr. 17). Also, she reported that her appetite fluctuated. (Tr. 17). She stated that she frequently woke up angry and that her moods changed from happy to angry, but she denied ever being diagnosed with bipolar disorder. (Tr. 17). Tucker reported that when she last worked at McDonalds her manager held a knife to her neck. (Tr. 17). After this incident, she testified that she began cutting herself. (Tr. 17). Tucker stated that she had not had a job since the incident. (Tr. 17). Tucker indicated that she had difficulty being in groups of people, but she agreed that she was open to attending group sessions at Bowen. (Tr. 18). She reported nightmares and flashbacks, yet she indicated that those had reduced with therapy and that her medications were helpful. (Tr. 18).

Tucker reported that she got along well with her mother and brother. (Tr. 18). She denied having friends over in the last few years and claimed that she preferred being alone most of the time. (Tr. 18). She indicated that her reading skills were poor, yet she testified that she wrote fiction and that she had a story copyrighted. (Tr. 18). Tucker's mother testified that Tucker had difficulty with change and criticism, and that she was distractible. (Tr. 18). Also, Tucker's mother indicated that Tucker struggled with daily living. (Tr. 18). She reported that Tucker had struggled her entire life due to abuse. (Tr. 18).

The ALJ found that Tucker's impairments could cause her alleged symptoms, but that she was not entirely credible regarding the intensity, persistence, and limiting effects of her symptoms. (Tr. 18). The ALJ noted that Dr. Yu-Mendador's records showed various physical complaints, yet Tucker had received minimal treatment and there were no recommendations for diagnostic imaging or referrals. (Tr. 18). The State agency determined that Tucker had the

7

capacity to work at a medium exertional level with minimal postural limitations. (Tr. 18). The ALJ indicated that the RFC granted great deference to Tucker to account for the effects of her back pain, obesity, and migraine headaches. (Tr. 18).

On January 9, 2013, Tucker went to the Bowen Center for her initial medication management visit with Dr. Maharjan. (Tr. 19). Tucker complained of back pain, however, the ALJ indicated that Tucker's pain level decreased at subsequent visits. (Tr. 19). The ALJ noted that at the most recent visit with Dr. Maharjan on June 20, 2014, Tucker reported a pain level of 2/10. (Tr. 19). Dr. Maharjan reported that no pain problems were present. (Tr. 19).

On April 21, 2013, B.T. Onamusi, M.D., performed a comprehensive consultative examination. (Tr. 19). Dr. Onamusi's results were negative other than obesity, therefore, Dr. Onamusi concluded that Tucker could perform light to moderate activities. (Tr. 19). In addition to back pain, Tucker complained of multiple daily headaches. (Tr. 19). She reported that her headaches had been reoccurring for approximately one year and that the pain level was at 11/10 at least two times per week. (Tr. 19). She indicated that the headaches began after she hit her head on a beam and was incapacitated for 45 minutes to one hour. (Tr. 19).

On June 17, 2012, Tucker went to the emergency room with a headache. (Tr. 19). She reported hitting her head and that she had two to three headaches per week with some nausea, but no vomiting. (Tr. 19). The head CT was normal and post concussive syndrome was diagnosed. (Tr. 19). The ALJ noted that Tucker reported to Dr. Yu-Mendador's office on August 28, 2012 that she had hit her head on a cabinet, rather than the beam as previously mentioned. (Tr. 20). The ALJ reported that Tucker's examination showed intact recent and remote memory. (Tr. 20).

The ALJ noted that at Tucker's January 17, 2013 and April 21, 2013 visits she did not complain about headaches. (Tr. 20). Also, the ALJ indicated that at the most recent primary

8

care visit on May 19, 2014, a review of systems was positive for headaches, but no specific complaints were made and no diagnosis was listed. (Tr. 20). The ALJ concluded that Tucker's allegations regarding the severity and frequency of her headaches were not well-supported and contributed to credibility concerns. (Tr. 20). The ALJ determined that there was no evidence that supported Tucker's reports of extreme headaches and that Dr. Yu-Mendador's records contradicted her complaints. (Tr. 20). However, the ALJ stated that he gave deference to Tucker's testimony that her headaches were triggered by loud noises and bright lights. (Tr. 20).

The ALJ indicated that the RFC limited Tucker to light work activity, precluding extreme climbing, and limiting other postural maneuvers to occasional performance to account for Tucker's back complaints. (Tr. 21). The ALJ noted that Tucker's obesity likely affected both her exertional and postural capacities and supported the restriction of light work. (Tr. 21). However, the ALJ found that Tucker's subjective complaints were not well-supported and that Tucker failed to establish physical limitations beyond the RFC. (Tr. 21). Also, the ALJ concluded that Tucker's allegations of mental impairments were not fully supported. (Tr. 21). The ALJ indicated that the diagnoses of PTSD and bipolar disorder were not considered severe impairments because they were made only during the consultative psychological examination. (Tr. 21). Therefore, the ALJ indicated that he assigned greater weight to diagnoses made during actual treatment. (Tr. 21).

The ALJ noted that Tucker failed to report at her consultative psychological examination on October 2, 2009, in connection with a prior application, the incident that occurred with her employer at McDonalds. (Tr. 22). The ALJ stated that Tucker first reported the incident during her intake at Bowen one month before this application was filed. (Tr. 22). Therefore, the ALJ

9

concluded that Tucker's failure to report the incident earlier and her vague responses regarding the handling of the complaint brought her reports into question. (Tr. 22).

Dr. Maharjan completed the initial psychiatric evaluation on December 19, 2012. (Tr. 22). Tucker was able to perform serial 7's correctly during the evaluation, despite being unable to during the October 2009 and March 2013 examination. (Tr. 22). Dr. Maharjan diagnosed Tucker with depressive disorder and anxiety disorder. (Tr. 22). Tucker began individual therapy in November of 2012. (Tr. 22). In June of 2013, she reported emotional abuse from her stepfather. (Tr. 22-23). Tucker and her mother acknowledged that they needed to move out due to the stepfather's abusive behavior, and by May of 2014, Tucker's mother had filed for divorce. (Tr. 23).

At the final therapy session, Tucker admitted that she often forgot to take her medications as also reflected in Dr. Maharjan's records. (Tr. 23). Even though Tucker was less than fully compliant with her medication, Dr. Maharjan's records showed improvement by March 2013 while on Abilify. (Tr. 23). In July, Tucker's symptoms increased, but she reported that she had been out of Abilify for one week. (Tr. 23). Her mood and anxiety improved by August 2013, but her insomnia worsened. (Tr. 23). The ALJ noted that by December of 2013 Tucker's mood, anxiety, and insomnia were all stable. (Tr. 23).

At Tucker's next appointment on May 21, 2014, she denied taking any medications and reported having mood swings, crying, and problems sleeping. (Tr. 23). Her mental status exam showed an irritable mood and restricted affect. (Tr. 23). The ALJ noted that at Dr. Maharjan's final recorded visit on June 20, 2014, he found Tucker's mood to be euthymic, but not controlled. (Tr. 23). He noted that her anxiety was stable and that she had good response to

medication. (Tr. 23-24). However, he indicated that her symptoms would increase when she was noncompliant. (Tr. 24).

Tucker offered a medical source statement from Dr. Maharjan into evidence. (Tr. 24). The ALJ found that the opinion did not accurately represent Tucker's functioning throughout the period in issue. (Tr. 24). The ALJ stated that the definitions in the questionnaire indicated that a moderate limitation was a disabling distraction. (Tr. 24). The ALJ concluded that the definition represented more than moderate limitations and that there was no way to know that Dr. Maharjan had read and applied the definitions. (Tr. 24). The ALJ noted that the questionnaire was completed on August 4, 2013, after Dr. Maharjan had seen Tucker on July 24, 2013. (Tr. 24). A review of the record established that the medical source statement was completed on August 14, 2013. (Tr. 489-490). The record indicated that at the July 24, 2013, visit Tucker was noncompliant with her medication and that her symptoms were increased. (Tr. 24).

The ALJ found that the Bowen records reflected improvement with therapy and medication. (Tr. 24). Also, Tucker indicated that treatment was helpful at the hearing. (Tr. 24). The ALJ determined that Dr. Maharjan's GAF score of 65 was inconsistent with the disabling symptoms and limitations that he imposed in the questionnaire. (Tr. 24). Also, the ALJ concluded that Dr. Maharjan's findings that Tucker had moderate and moderately severe limitations were inconsistent with the overall treatment records. (Tr. 24). Therefore, the ALJ determined that the medical source statement was entitled to little weight. (Tr. 24).

At step four, the ALJ found that Tucker had no past relevant work. (Tr. 25). Considering Tucker's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that she could perform, including housekeeper/cleaner (2,000 jobs

statewide and 130,000 nationwide), routing clerk (1,100 jobs statewide and 50,000 nationwide), and package sorter (1,000 jobs statewide and 43,000 nationwide). (Tr. 26).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Moore v. Colvin***, 743 F.3d 1118, 1120–21 (7th Cir. 2014); ***Bates v. Colvin***, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence."). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting ***Consol. Edison Co. v. NLRB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see* ***Bates***, 736 F.3d at 1098. A court must affirm an ALJ's decision if the ALJ supported his findings with substantial evidence and if there have been no errors of law. ***Roddy v. Astrue***, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003).

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C.**

**§ 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. § 416.920(b)**. If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. § 416.920(e)**. However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f)**.

Tucker has argued that the ALJ improperly evaluated the opinion of Dr. Santosh Maharjan. A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. **20 C.F.R. § 404.1527(d)(2)**; *see Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)); *see* **20 C.F.R. § 404.1527(d)(2)** ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

"'[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight' and becomes just one more piece of evidence for the ALJ to consider." *Bates*, 736 F.3d at 1100. Controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. *Schmidt*, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); *see, e.g.*, *Latkowski v. Barnhart*, 93 Fed. App'x 963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. App'x 939, 942 (7th Cir. 2004). If the ALJ was unable to discern the basis for the treating physician's determination, the ALJ must solicit additional information. *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014) (citing *Similia v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009)). Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to

assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." **Hofslien v. Barnhart**, 439 F.3d 375, 377 (7th Cir. 2006) (internal citations omitted); *see* **Punzio**, 630 F.3d at 713.

Tucker has argued that the ALJ made an incorrect statement regarding the medical source statement that was completed by Dr. Maharjan. Tucker contends that the ALJ confused the definition of moderate on the questionnaire. The ALJ stated that the definitions provided in the questionnaire indicated that even "moderate" limitations in any area of functioning would result in disabling distraction. (Tr. 24). The definition of moderate on the questionnaire was that an individual would be distracted from the job 11% to 20% of a workday or work week. (Tr. 489). The VE testified that an individual must be on task 80% to 85% of a workday to perform competitive work. (Tr. 90). Thus, if Tucker was distracted from the job for 15% to 20% of the workday it may preclude some competitive work.

The Commissioner indicated that Dr. Maharjan found that Tucker had moderate-severe limitations in making simple work-related decisions, performing at a consistent pace without an unreasonable number and length of rest periods, and completing a normal workday or workweek without interruptions from psychologically-based symptoms. The Commissioner contends that that the State agency psychologist assessed Tucker with only moderate limitations in any area of functioning. However, the circuit court has made clear that what matters are the reasons articulated by the ALJ. **Spiva v. Astrue**, 628 F.3d 346, 353 (7th Cir. 2010); **Larson v. Astrue**, 615 F.3d 744, 749 (7th Cir. 2010). Although the ALJ cited the opinions the agency psychologists, he did not use their opinions to support his decision to give little weight to Dr. Maharjan's opinion. *See* **20 C.F.R. § 404.1527(d)(2)**; **Larson,** 615 F.3d at 751; **Moss v. Astrue,** 555 F.3d 556, 561 (7th Cir. 2009).

15

Tucker has argued that it was improper for the ALJ to fault her for her noncompliance with medications. She indicated that she had problems affording medications. Tucker contends that under **SSR 96-7** the ALJ needed to question her further when there was evidence in the file of noncompliance. The Commissioner indicated that the ALJ did not find that her noncompliance cut against her credibility. Rather the ALJ concluded that Dr. Maharjan's opinion was completed shortly after a visit with Tucker while she was noncompliant with her medications, therefore, her symptoms were increased.

The ALJ's decision indicated that the medical source statement was entitled to little weight because it was answered by Dr. Maharjan shortly after he had seen Tucker while she was noncompliant with her medications on July 24, 2013. The ALJ noted that the record stated that on July 24, 2013, Tucker had increased symptoms due to noncompliance with her medication. (Tr. 24). Dr. Maharjan's records reflected that Tucker had periods of noncompliance. (Tr. 23). Tucker reported that she had been out of Abilfy for one week because she forgot to get the medication from patient assistance. (Tr. 23). The ALJ indicated that by August 23, 2013, Tucker's mood and anxiety already had improved while on Abilfy. Her symptoms increased again in May 2014, however, she reported that she was noncompliant. Dr. Maharjan indicated that Tucker showed good response to medication with increased symptoms usually occurring during periods of noncompliance. (Tr. 23-24). Also, he indicated that throughout his visits Tucker had no memory problems and her attention and concentration were fair or good. (Tr. 24).

The ALJ concluded that the questionnaire had been completed 16 months prior to the decision and while Tucker was noncompliant. Therefore, it did not accurately reflect her functioning throughout the period in issue. The ALJ did not rely on Tucker's noncompliance as a ground for denying disability, rather as a factor in discrediting Dr. Maharjan's opinion. In

16

addition, the ALJ indicated that Tucker's records at Bowen reflected improvement with therapy and medication and that Tucker had reported that treatment had been helpful.

The ALJ also found that Dr. Maharjan's initial GAF score of 65 was inconsistent with his finding that Tucker had moderate and moderately severe limitations. Tucker has argued that it was improper for the ALJ to find that Dr. Maharjan's GAF score was inconsistent with his opinion. She contends that her mental illness is an episodic one, therefore, she can be functioning on one day and significantly different on another. However, the Seventh Circuit has upheld the ALJ's decision to consider GAF scores to some degree. ***Walters v. Astrue***¸ 444 F. App'x 913, 919 (7th Cir. 2011). A GAF score of 61–70 indicated "some mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well." ***Am. Psychiatric Ass'n, Diagnosis and Statistical Manual of Mental Disorders***, Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV–TR). The court finds that Tucker's December 2012 GAF score of 65 was wholly inconsistent with Dr. Marharjan's finding that she had moderate and moderately severe limitations.

The ALJ minimally articulated his reasoning to give little weight to Dr. Maharjan, and his decision was supported by substantial evidence. The medical source statement shed little light on Tucker's overall abilities because it was completed shortly after she reported that she was noncompliant with her medications. Also, the ALJ found that Dr. Maharjan's opinion was inconsistent with his GAF score and the overall record. The record indicated that Tucker's condition improved with medications, as reflected in appointments with Dr. Maharjan in late 2013 and the Bowen treatment records. Thus, the ALJ determined that the medical source statement was reflective of only a brief window of time. Therefore, the ALJ has presented good reasons to assign little weight to Dr. Maharjan.

Based on the foregoing reasons, the decision of the Commissioner is **AFFIRMED.**

ENTERED this 29th day of March, 2017.

/s/ Andrew P. Rodovich
United States Magistrate Judge